Filed 7/6/21  L.R. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| L.R., | |
| Petitioner, | |
| v. | G059599 |
| THE SUPERIOR COURT OF ORANGE COUNTY, | (Super. Ct. Nos. 07WF2103 & 19DL1078) |
| Respondent; | O P I N I O N |
| THE PEOPLE, | |
| Real Party in Interest. | |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Lewis W. Clapp, Judge.  Petition denied.

James M. Crawford for Petitioner.

Todd Spitzer, District Attorney, and Holly M. Woesner, Deputy District Attorney, for Real Party in Interest.

No appearance by Respondent.

This is a unique case.  The juvenile court had to determine whether 29-year-old L.R. should be retained in the juvenile court for crimes he committed when he was 16 years old and the jury convicted him of 10 years earlier.  The court concluded he should not.  In his petition for writ of mandate, L.R. argues the court erred by ordering him transferred to criminal court.  We disagree and deny the petition.

## I.  Facts of the Offense

Around midnight one summer evening in 2007, L.R. and Jose Armendariz, who were both 16 years old, and Luis Menchaca and Diane Estrada decided to "hit up" Oliver Martinez and Michelle Miller as they walked on a freeway overpass.  L.R., Armendariz, and Menchaca were members of the Down Crowd gang, and Menchaca recognized Martinez as a member of Crow Village, a rival gang.  Menchaca asked Martinez if he had a lighter.  Martinez replied, "'Aren't you that pussy from dick cravers?'" which was a derogatory term for the Down Crowd gang.  Menchaca said, "'Fuck Crow.'"  L.R. pulled out a handgun and shot Martinez, shot Miller, and shot Martinez a few more times.  Martinez and Miller died.  L.R. reloaded the gun and gave it to Armendariz.

As L.R. and his confederates left the scene, Estrada called a friend to pick them up.  The police arrived before they could escape.  Armendariz hid the gun, and L.R. threw a pair of gloves.  A police officer found both.  Forensic testing revealed L.R.'s DNA was on the gun and gloves, and he had gunshot reside on his right hand.  Armendariz's dominant left hand was not tested for gunshot residue because it was in a cast.  Estrada told police that L.R., Armendariz, and Menchaca followed the victims but she did not know who shot them because she remained behind to act as the lookout.  L.R. told officers he was a member of Down Crowd with the moniker of "'Turtle'" and named two rival gangs, neither of which was Crow Village.  He denied knowing Armendariz or Menchaca, or being involved in the shooting.  Menchaca told officers he was a member of Down Crowd with the moniker of "'Puppet'" and said Crow Village was a rival gang.

2

He eventually recounted the gang confrontation and L.R.'s shooting the two victims. Armendariz corroborated Menchaca's account.

## II. Criminal Court Proceedings

An amended information charged L.R. with two counts of murder for a criminal street gang (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(3), (22),[1] counts 1 and 2) and street terrorism (§ 186.22, subd. (a), count 3). As to counts 1 and 2, the information alleged L.R. was 16 years of age (Welf. & Inst. Code, § 707, subd. (d)(1)), he committed the offenses for a criminal street gang (§ 186.22, subd. (b)(1)), and a principal intentionally discharged a firearm causing death (§ 12022.53, subds. (d), (e)(1)). L.R. turned 16 years old just 25 days before the offenses.

At trial, the prosecution's theory was L.R. was the actual shooter while Armendariz aided and abetted in the murders. During the first trial, the jury convicted L.R. of count 3 but could not reach verdicts on counts 1 and 2. During the second trial, the jury convicted L.R. of counts 1 and 2, and found true all the allegations. In January 2011, the trial court sentenced L.R. to prison for life without the possibility of parole plus 65 years.

## III. Appellate Court Proceedings

In *People v. Ramirez et al.* (2013) 219 Cal.App.4th 655, we affirmed L.R.'s convictions, reversed his sentence because it amounted to cruel and unusual punishment, and remanded for resentencing. Our Supreme Court granted the Attorney General's petition for review and later transferred the matter to this court to reconsider its decision in light of *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*). (*People v. Ramirez* (Dec. 18, 2013 & July 9, 2014, S214133 [nonpub. orders].)

In *People v. Ramirez et al.* (Aug. 27, 2014, G044703) [nonpub. opn.], we again affirmed his convictions but reversed his sentence and remanded the matter to the

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

3

trial court to resentence L.R. in light of *Gutierrez, supra,* 58 Cal.4th 1354. In our opinion, as relevant here, we explained Menchaca testified in exchange for a plea deal. Menchaca testified concerning the charged offenses and uncharged conduct involving him, L.R., and Armendariz. The two instances of uncharged conduct occurred one month and a few days before the charged offenses. They went into rival gang territory, initiated gang challenges to young males, and Armendariz shot his gun at the young males but missed. Later, our Supreme Court denied L.R.'s petition for review. (*People v. Ramirez* (Nov. 12, 2014, S221726 [nonpub. order].)

IV. *Further Criminal Court Proceedings*

The trial court continued resentencing numerous times over the next two years. Before the trial court resentenced L.R., California voters passed Proposition 57, which changed Welfare and Institutions Code sections 602 and 707 (section 707) regarding prosecution of minors in adult court. (Prop. 57, as approved by voters, Gen. Elec. (Nov. 8, 2016).) After the parties filed sentencing briefs, L.R. filed motions requesting the trial court transfer the case to juvenile court pursuant to Proposition 57. The prosecution filed opposition. The trial court granted L.R.'s request to transfer the case to the juvenile court but stayed the transfer.

The Orange County District Attorney (OCDA) appealed. He also filed a petition for writ of mandate/prohibition and requested an immediate stay. This court granted in part the request for an immediate stay, but we allowed the juvenile court to proceed with any scheduled hearing to allow witnesses to testify. (*People v. Superior Court (Ramirez)* (July 12, 2018, G056544 [nonpub. order].) Later, we summarily denied the petition for writ of mandate and dissolved the stay. (*People v. Superior Court (Ramirez)* (July 27, 2018, G056544 [nonpub. order].) Our Supreme Court denied the OCDA's petition for review. (*People v. Superior Court (Ramirez)* (Oct. 10, 2018, S250418 [nonpub. order].)

4

In *People v. Ramirez* (2019) 35 Cal.App.5th 55, 67-68, this court concluded the trial court properly transferred the matter to the juvenile court to conduct a transfer hearing. Our Supreme Court denied the OCDA's petition for review.[2] (*People v. Ramirez* (Aug. 14, 2019, S256191 [nonpub. order].) The trial court transferred the case to the juvenile court to determine whether L.R. should be transferred to criminal court pursuant to section 707, subdivision (a)(2).

## V. *Juvenile Court Proceedings*

After transfer, the Orange County Probation Department (OCPD) and Dr. Martha L. Rogers filed reports with the juvenile court. We discuss both reports in detail.

### A. *OCPD Section 707 Report*

Probation officer Pablo Yepez prepared the OCPD's section 707 report. In his report, Yepez addressed the following: the circumstance of the offense and investigation; victim information; his interviews of L.R. and his parents, and other interested parties; L.R.'s youth, family, school history, and adjustment in custody; and section 707's five fitness criteria.

As to his interview of L.R., Yepez stated L.R. admitted he was "infatuated with the gang lifestyle" and he sought comfort and acceptance from gang members who he met in junior high school. He was "jumped into Down Crowd" about one year before the incident. He was arrested for alcohol possession and given the opportunity to resolve the arrest informally by going to substance-abuse counseling, but he refused to participate. L.R. explained that after his brother died unexpectedly, he understood the pain he caused the victims' families. He expressed remorse for his actions and

---

[2]      We grant L.R.'s request to take judicial notice of the record on appeal in case No. G056522. (Evid. Code, §§ 459, 452, subd. (d).) We assume his additional reference to *People v. Torres*, case No. G058849 was a typographical error because it is unrelated to this case.

"believe[d] he had 'learned his lesson.'" While in custody, L.R. earned his high school diploma, read philosophy books, and taught himself a foreign language. He participated in minimal "'prison politics'" to avoid being assaulted. He denied taking drugs or drinking "pruno." He did not participate in rehabilitative programs because he was ineligible and he did not participate in counseling because of "'prison politics.'" But he admitted he previously dealt with anger by acting aggressively and stated he learned how to be patient and "calm himself down." L.R. said that if he were released, he would live with his family and help his parents, study electrical engineering in college, and help "'kids like him.'"

With respect to his youth and family history, Yepez stated L.R.'s mother reported he was one of six children and he met all development milestones. His mother stated she was "'over protective'" and L.R. was rebellious and would disobey her and her husband. She added their relationship changed when she returned to work. His mother did not know L.R.'s friend but learned from a police officer his friend's residence was "a known 'gang house.'" L.R.'s parents did not believe he suffered any childhood distress. His mother reported one occasion when she slapped her husband, and he struck her—the young L.R. saw the retaliation. It did not appear the incident affected him. As to the day of the shooting, Mother said she had to go to Tijuana to obtain dental work. L.R. wanted to join her, but she declined because she had to bring a piece of furniture back with her. She blamed herself for what happened. L.R.'s father admitted he was an alcoholic while L.R. was a child.

Yepez reported L.R. was in gifted and talented education (GATE) in elementary school and advanced classes in intermediate school. L.R. noticed his friends were not in the same advanced classes and he purposefully failed them so he would not be called a "'nerd.'" In high school, L.R. developed a truancy problem and stopped attending school. He attended a few continuation schools where he associated with "negative peer influences."

6

Yepez detailed L.R.'s adjustment on probation and in custody. Probation records showed he had two previous charges the OCDA dismissed. While in Orange County Juvenile Hall from 2007 to 2009, L.R. suffered 18 behavior notices and five special incident reports. One behavior notice involved displaying gang hand signs during church. One special incident report involved getting tattooed. He met with a therapist on three occasions. In prison from 2011 to 2014, he suffered two rule violation reports. The first involved the destruction of property. We provide the following description of the second August 2012 incident in its entirety: "[L.R.] and 49 other Southern Hispanic inmates were involved in a mass disturbance. [Records] indicate two Southern Hispanic inmates were non-compliant with correctional officers responding to an unrelated incident. One of the Southern Hispanic inmates took a combative stance against the correctional officers, as the remainder of the Southern Hispanic inmates including [L.R.] advanced toward the 'skirmish line.' Consequently, [L.R.] received 12 months of Administrative Segregation Confinement for violating rule 3005(d)(1)—Battery on Non-Inmate with insufficient force to cause serious injury." While at the Theo Lacy Facility from December 2014 to the time of the report, L.R. suffered six incident reports, two of which bear mentioning. In July 2018, L.R. "'flipped off'" the guard station because the guard turned the television off. We provide the following description of the April 2019 incident in its entirety: "Deputies observed an inmate from an adjoining unit pass contraband to another inmate through the connecting door. The deputies attempted to retrieve the contraband from the inmate who received the contraband. The deputies attempted to search the inmate's cell, but he became defiant. During this time, [L.R.] was located at the dayroom phones. [L.R.] then ran toward the deputies in an attempt to assist the defiant inmate. [L.R.] reached for a responding deputy's hands. [L.R.] stated at the disciplinary hearing, 'I have nothing but respect for the deputies. I'm sorry.' Consequently, [L.R.] received 30 days of Disciplinary Isolation." L.R. said he had to get involved because of "'prison politics.'"

Yepez reported Miller's mother stated Miller's 15-year-old son has been without his mother for 12 years. Miller's mother was in disbelief L.R. could go home and asked when her daughter can come home. He reported Martinez's father became ill during the trial when he saw photographs of his son trying to protect Miller.

Yepez addressed section 707's criteria. As to L.R.'s criminal sophistication, Yepez reported L.R. did not suffer from any cognitive or developmental delays. Although L.R. saw one instance of domestic violence between his parents, L.R. did not believe the incident affected him. Yepez stated 16-year-old L.R. exhibited sophistication in arming himself and using a gun but he exhibited immaturity and impulsiveness when reacting violently to Martinez's verbal slight. Additionally, L.R. refused to cooperate with the officers' investigation. Yepez opined L.R. exhibited "a moderate degree of sophistication."

With respect to whether L.R. could be rehabilitated prior to the juvenile court's jurisdiction expiring, Yepez stated 28-year-old L.R. was beyond the juvenile court's jurisdiction. Based on his age, L.R. would be subject to a two-year period of control from the date of commitment and would serve 18 months. Yepez opined he would benefit from postrelease transitional support and supervision. Alternatively, the court could sentence him to stayed time and refer him to the Youth Development court where he could receive services.

As to L.R.'s previous delinquent history, Yepez reported L.R. purposefully failed his intermediate school honors classes. L.R. began associating with Down Crowd gang members during ninth grade. While at various continuation high schools, his behavior deteriorated. Yepez reported L.R. has not benefited from previous attempts at rehabilitation because this was the first allegation filed in the juvenile court.

Finally, after reciting the circumstances of the offenses, Yepez reported he was unable to interview L.R. about the offenses. Yepez stated, however, L.R. was remorseful for his conduct and regretted the pain he caused the victims' families.

8

In conclusion Yepez opined L.R. was mature and appeared eager to participate in the interview. Yepez added L.R.'s father's alcoholism and the domestic violence incident could have affected him. Yepez "credit[ed]" L.R. for his "minimal" in-custody disciplinary history. The circumstances of the offense caused Yepez concern. Yepez explained that although L.R. had not benefitted from rehabilitative services, "it appears as though [he] is on the appropriate path to rehabilitation." Yepez opined, "It is believed that [L.R.] would have been found suitable for [j]uvenile [c]ourt proceedings had a previously . . . [section] 707 report been originally ordered." Yepez recommended the juvenile court find L.R. to be suitable for juvenile court proceedings.

B. *Rogers' Report*

Rogers conducted a psychological evaluation and submitted a report on L.R.'s behalf. Rogers reported 28-year-old L.R. did not suffer from any early development problems and he met his physical and mental milestones. As an adolescent, L.R. was overweight, which caused him insecurity, and his family called him "'Gordo,'" which caused him embarrassment. L.R. was in GATE and honors classes, but the intermediate school moved him to regular classes because of a lack of effort, disciplinary problems, and truancy. He wanted "to fit in and be cool" and "prove himself to peers." L.R.'s school records stated his parents failed to hold him accountable and did not give permission to receive counseling services in October 2006. He admitted he suffered two juvenile arrests, which were resolved informally. He said that while incarcerated he taught himself German, and studied philosophy, history, psychology, and religion. His reading helped his mind and love of learning to grow. He wanted to be an engineer, teacher, or machine operator. L.R. admitted he was an underage drinker and had a problem with alcohol. He also admitted that while incarcerated, he drank alcohol four or five times, once as recently as two and one-half years ago. He refused to participate in counseling as a youth and did not participate in in-custody services because of "'prison politics.'" He denied participating in any gang-related misconduct while in custody. He

added that while in custody, he did his best to "stay out of trouble," but he was not always successful. He explained it was not his fault, and he did what he had to do to survive.

Rogers reported L.R. answered a series of self-appraisal prompts. L.R. stated the worst day of his life was when his brother died unexpectedly. When asked what he liked best about himself, he answered he was "a good-looking person" and his "mind: my intellect." When asked what he liked least about himself, he answered the following: "[T]here is not really much I dislike about myself. . . . I guess physically I would like to look a bit more fit but that could change through more exercise and way better dieting. Also [sic] would like to work on my posture to stand up straighter. Other than that, I'm [okay] I think." When asked what he would change about himself, he said his eyesight so he did not have to wear glasses, but nothing else. A prompt asked L.R. what he would do if he could turn back the clock and unring the bell. He replied the following: "[D]efinitely study harder in school. Try to have a better work ethic as a kid. Not care what others think . . . . Not pick bad friends. Not join a gang. Read more and learn more. There's a lot of things I'd do differently." L.R. stated if he could change one thing he would not be incarcerated but free to live a good life. He said the biggest mistake he made was joining a gang because "[e]verything negative that has happened [was] a culmination or probable consequence of that." L.R.'s three wishes were the following: "I would wish for my freedom, to have perfect health and perfect health for my family . . . I would want freedom above all else because it'd give me the liberty and possibility to work and follow my dreams . . . ."

Rogers administered several psychological tests to provide a comprehensive evaluation of L.R. Rogers reported L.R. exhibited a "slight propensity towards positive self-presentation." He also exhibited feelings of helplessness, anxiety, stress, worry, and a preference to avoid interacting with others. Finally, he suffered from

low self-esteem and excessive self-criticalness and he met the criteria for being at a higher risk of committing suicide.

Rogers reported L.R. acknowledged having problems with negative relationships and resented people he could not control. He avoided deeper relationships because he feared people would demand more than he could cope with and he was "constantly concerned about how others view him." She added he "tests as more socially inept than he presents himself" and "[h]is emotional neediness may lead to ineffective or maladaptive behavior in close relationships." Rogers explained he thinks "logically" to make "reasonable conclusions about relationships," but he intellectualizes to cope with unfamiliar, unmanageable, or unpleasant feelings. She added, "he may need to spend extra time figuring out how to adapt to unfamiliar or changing circumstances." Rogers opined his test results showed he was elevated for Obsessive Compulsive and Narcissistic Personality Disorder.

Rogers reported L.R.'s alcohol use "classif[ied] him as having had a high probability of a severe substance abuse use disorder in the six months" before the murders. His disorder would have placed him "at a relatively high risk for legal problems and other types of norm violations compounded by his substance abuse[]" and his "risk of acting out would have been very high." Rogers diagnosed L.R. as suffering from alcohol use disorder and dysthymic disorder with obsessive-compulsive traits.

Rogers addressed section 707's criteria, but she did not make a definitive finding on each criterion. Instead, she recited each criterion's elements and discussed the relevant evidence without opining whether the criterion weighed in favor of retention or transfer.

With respect to the degree of criminal sophistication, Rogers opined it was reasonable to conclude his cognitive abilities were average or better for his age at the time of the offenses because he tested as gifted. She explained the ability to delay and think through consequences are not fully formed in 16-year-old males. She added his

11

alcohol abuse exacerbated the situation by impairing his judgment and increasing his impulsivity. Rogers stated L.R.'s mother was overprotective and when she returned to work, L.R. sought direction and approval from older gang members with whom he was "'infatuated.'" For example, he refused gifted school programming to avoid his peers ridiculing him. Rogers stated that although L.R. did not create the distraction, the circumstances of the offense demonstrated intentionality—he participated in a gang challenge, and after he shot a rival gang member, he shot a second victim and reloaded the gun. She opined that when under pressure, L.R. was "more prone to comply and/or act before thinking" Rogers concluded he was still reluctant to agree he looked up to his codefendants for approval and "he tests still as not skilled interpersonally, somewhat socially avoidant and was likely more dependent on both these two codefendants for social approval and seeking status with them in the gang."

As to whether L.R. could be rehabilitated before the expiration of juvenile court's jurisdiction, Rogers noted he was beyond the scope of local juvenile court jurisdiction. She added that because of his age, this was a unique situation and if he was released, "there should be a careful plan in place . . . with particular focus upon substance abuse treatment."

With respect to L.R.'s previous delinquent history, Rogers stated he started associating with Down Crowd gang members when he was in ninth grade and with six months to one year, his behavior "'spiraled out of control.'" (Italics omitted.) She opined L.R.'s parents were not assertive enough to control him.

With respect to the success of previous attempts by the juvenile court to rehabilitate L.R., Rogers noted his parents refused school counseling probably because he told them he would not attend. At the time of the offenses, he was "socially dependent" and he was prone to depression. She explained he was amendable to treatment. She cited to the fact that since he had been in custody, he sought and admired adult role models who provide him guidance to achieve his goals. She concluded he needed help adjusting

to adult-level life in the community, dealing with age-appropriate relationships, finding educational and occupational training, and managing stress without alcohol.

As to the circumstances and gravity of the offense, Rogers noted L.R. shot and killed two people and "[t]here's no way that the severity of the offenses can be minimized." She added L.R. considered his gang involvement "'stupid.'" (Italics omitted.) She opined, however, he was genuinely remorseful for what he did and the pain he caused the victims' families, in part because of the deep impact his brother's death had on him.

Rogers concluded L.R. matured significantly and would benefit further from services to deal with the issues if he were released. She stated he developed the self-discipline to participate in any programming and he was an excellent candidate for education and training. She said he had a good likelihood of becoming a skilled tradesperson or professional "if his felonies can be overcome." She stated his substance abuse issues "should be continually monitored." She opined, "his risk in the community is minimal as long as he remains substance-free."[3]

## C. Evidentiary Hearing

At a multi-day hearing, the juvenile court heard from three witnesses and admitted into evidence the parties' exhibits. The court admitted into evidence the prosecution's exhibits: section 707 report, our prior opinion in *People v. Ramirez et al., supra,* G044703, and a transcript of Farmer's testimony. The court also admitted into evidence L.R.'s exhibits: our prior opinion in *People v. Ramirez, supra,* 35 Cal.App.5th 55, Rogers' report, letters, and certificates, and L.R.'s letter.

---

[3] The parties disagree about the import of Rogers' opinion. In his petition, L.R. asserts Rogers, like Yepez, concluded he should remain under and was suitable for juvenile court jurisdiction. The OCDA disputes this. In his reply, L.R. cites to Rogers' discussion of the five criteria. Rogers never expressly opined the juvenile court should retain jurisdiction. Her discussion of the five criteria speaks for itself.

13

Yepez testified at length about his section 707 report, and we need not repeat that information. We provide his testimony where it supplements or provides context to his report. Yepez testified this was the third or fourth section 707 report he had prepared. His recitation of the circumstances of the offense was based on police reports and not trial court transcripts. He stated there was no evidence L.R. had been "jumped out" of the gang or been debriefed to demonstrate a severed connection from the gang. As to L.R.'s in custody disciplinary history, Yepez stated the tattoo he got was a Down Crowd gang tattoo. Yepez described the mass disturbance involving 50 inmates and the physical altercation with the officer as both gang related, i.e., L.R. had to participate or the gang would assault him. He equated "prison politics" as gang activity. Regarding his statement L.R. did not participate in counseling because of prison politics, L.R. told him that if you participate in counseling "you are no longer good to the gang" and you become a target. Yepez believed L.R.'s possessed above average intelligence, but noted he was the only person in his family to have been involved in a gang.

On cross-examination, Yepez stated he considered L.R.'s in custody academic achievements and self-study of various subjects in making his recommendation. He said one correctional officer described L.R. as "a really good kid in custody[]" and "well-behaved." Yepez thought it demonstrated maturity to immediately apologize to the deputy who he tried to grab and he accepted his punishment without comment. He said L.R. participated in substance abuse counseling and anger management studies "when that was available." On redirect examination, Yepez admitted he took L.R.'s claims about self-studying German and philosophy at face value. On recross-examination, Yepez agreed L.R. mentioned specific philosophy books and quoted from them.

The juvenile court asked Yepez to clarify his statement in the section 707 report that had the court conducted a section 707 hearing in 2007, the court would not have transferred him to criminal court. Yepez admitted he did not know what the court

14

would have done then.  On redirect examination, he clarified that in 2007, the OCPD would have concluded he was suitable for juvenile court.

L.R.'s father testified on his behalf.  Father stated that since L.R. had been in custody, his family visited him on a regular basis because they loved him and were devoted to him.  Father stated the family was committed to helping L.R. achieving his personal, education, and career goals if released from custody.  Father said L.R. had improved himself while in custody and they would help him obtain any counseling he needed to transition back into society.

L.R.'s younger brother (Brother) testified on his behalf.  Brother stated they were close growing up until L.R. started hanging out with older guys who were "losers" the summer before L.R.'s freshman year.  Brother visited L.R. regularly while he was in custody, and L.R. genuinely seemed to want to rebuild their relationship.  Brother believed L.R. had matured emotionally and spiritually.  Brother said the entire family was committed to supporting L.R. if he were released.  Finally, Brother stated L.R. was not a danger to society because he was committed to being a good citizen and member of the family, educating himself, and working.

The parties stipulated to admission of the former testimony of Department of Juvenile Justice (DJJ) Patrol Agent Michael Farmer, a court and probation department liaison with the intake services section.  Farmer provided detailed testimony about DJJ jurisdiction, intake categorization, and programming.  Farmer stated that at intake, a juvenile undergoes psychological, educational, and sociological assessments to develop an individualized treatment plan.  He explained the treatment plan was based on cognitive behavioral interventions that focused on changing how juveniles think, feel, and behave.  He said there was a program designed to assist juveniles with social networking, i.e., peer pressure, but there was no gang intervention program.  Farmer explained that if a person was sentenced to a life term, the jurisdiction expired at the age of 25 or two years from the date of commitment if the person was already over the age of 23.  He added DJJ had

15

about 18 months to work with a juvenile because they were transferred to the court and probation department three to four months before they were released. He stated individuals were categorized and provided a release hearing date based on the crime committed and the murder baseline was seven years. He added that in preceding years, the length of stay for a first degree murder offense was between 47 and 70 months. On cross-examination, Farmer stated older individuals who were committed to DJJ participated in their program more effectively and efficiently because of their experience.

After the close of evidence, the prosecutor argued DJJ did not have the necessary time or programming to rehabilitate L.R. The prosecutor asserted L.R.'s conduct and statements demonstrated he had aged but not matured. He added his career plans were unrealistic and inconsistent, telling people what they wanted to hear. The prosecutor argued there was evidence to support each of the five criteria and the court should order him transferred to criminal court.

L.R.'s counsel provided argument to supplement his written brief. Counsel noted L.R. turned 16 years old less than one month earlier, and "but for those few days, he would have stayed in juvenile court." Counsel argued the prosecution failed its burden to establish L.R. could not be rehabilitated and his record in custody demonstrated he could be rehabilitated. Counsel stated the OCPD would have found him suitable for juvenile court both then and now. Counsel added Rogers, who subjected him to a comprehensive and probing examination, also concluded he was suitable for juvenile court.

At a hearing the next day, the juvenile court ordered L.R. transferred to criminal court. The court thanked counsel for a professional and exhaustive presentation. After noting a minor's brain is not fully developed, the court stated it spent a lot of time on weekends and mornings considering all the evidence to arrive at a just result in these very difficult cases. The court informed counsel it would address each factor and the

16

relevant evidence, and indicate where the prosecution satisfied its burden and where it did not.

First, the juvenile court initially opined L.R. exhibited "a high degree of criminal sophistication" but clarified it "was sophisticated." The court noted that although Martinez's insult of Down Crows was spontaneous, L.R. did not act impulsively because he armed himself and participated "in a gang hit up." The court cited to the fact that after he shot Martinez, he shot Miller, reloaded the gun, and gave the gun to Armendariz. The court opined that for a 16 year old, he was of average maturity and above average intelligence. The court was troubled by the fact he consciously decided to fail his classes to gain acceptance and prove himself in the gang. The court opined, "[t]here's no doubt that the peers that he had at that time probably exerted some pressure on his behavior, at least in his own mind, he decided that he wanted to -- in fact, I think he said he wanted to prove himself to gain acceptance." The court added there was no evidence he suffered any mental or emotional trauma. The court concluded the prosecution satisfied its burden on this factor.

As to the second criterion, whether the juvenile court could rehabilitate L.R. before its jurisdiction expired, the court concluded it did not weigh in favor of retention or transfer. The court commended him on the progress he had made in his education, rehabilitation, and maturation. The court noted he attended a few therapy sessions but he did not take advantage of juvenile hall's extensive programming. The court balanced his progress against his in custody disciplinary record and the time it had to rehabilitate him—at most two years. The court was troubled by the fact L.R. allowed prison politics to result in two disciplinary violations, and prevented him from participating in rehabilitative programming. After stating L.R. shot Martinez and Miller in part because of peer pressure or to prove himself, the court opined him submitting to pressure was "a recurring theme" that concerned the court. When L.R.'s counsel questioned the court's characterization of the mass disturbance incident and said L.R. was

17

not charged with a crime, the court explained it based its opinion solely on the report's description of the incident. The court concluded the evidence left it "doubting" there was sufficient time to rehabilitate him before the court lost jurisdiction. The court repeated the criterion did not weigh in favor of retention or transfer and "pretty much evens out."

The juvenile court explained the third criterion, L.R.'s delinquent history, weighed in favor of retaining him in juvenile court. The court explained L.R. exercised poor judgment by purposefully failing honors classes and associating with gang members but he did not suffer any criminal charges. It also reasoned he exercised poor judgment during the two instances of uncharged conduct. The court mused the uncharged conduct was unreliable because Menchaca received a greatly reduced sentence.

The juvenile court also concluded the fourth criterion, previous attempts to rehabilitate, also weighed in favor of retaining jurisdiction in juvenile court. The court noted that although L.R. refused his parents' efforts to enroll him in substance abuse counseling, "there really haven't been any" attempts to rehabilitate him.

Finally, the juvenile court opined the circumstances and gravity of the offense, the fifth criterion, weighed in favor of transferring him to criminal court. The court reasoned L.R. armed himself with a loaded gun and "participate[d] in a gang hit up." It said he intentionally shot Martinez and then decided to shoot Miller. The court added the harm was great because they were both dead, and Miller left a son who grew up without his mother. The court opined his conduct was not the result of significant trauma that would have impaired his mental and emotional development. The court concluded this factor weighed in favor of transfer to adult court.

The juvenile court concluded, "So in totality, the court believes that the [OCDA] has met his burden of proof by a preponderance of the evidence. [¶] . . . [Yepez's and Rogers'] recommendations, while appreciated, are not determinative . . . . [¶] So the court's finding and ruling is that he should be transferred to adult court."

18

DISCUSSION

"To justify the transfer of a minor from juvenile court to the criminal court system, the prosecution bears the burden of establishing by a preponderance of the evidence the minor is not a suitable candidate for treatment under the juvenile court system. [Citations.] There are five statutory factors. The court shall consider the five factors and recite the basis for its decision in an order entered upon the minutes. [Citation.]" (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 715 (*J.N.*).)

"[A] decision to transfer a minor to adult/criminal court . . . require[s] a juvenile court to clearly and explicitly 'articulate its evaluative process' by detailing 'how it weighed the evidence' and by 'identify[ing] the specific facts which persuaded the court' to reach its decision. [Citation.] In most cases, this requirement will be met where the juvenile court performs a factual analysis of the relevant factors as to each criterion— as the juvenile court did in this case—and then specifies the criteria that weighed in favor of transfer. . . . In all cases, appellate review would be greatly assisted if the juvenile court states which of the . . . criteria weighed in favor of transfer, against transfer, or neither in favor of or against transfer." (*C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1029, fn. omitted (*C.S.*).) "Nothing in section 707 indicates that the . . . court [is] required to give equal weight to each of the five criteria or that it would necessarily be an abuse of discretion to find that one criterion outweighed the other criteria." (*Id.* at p. 1035.)

"We review the juvenile court's finding the minor was unsuitable for treatment in the juvenile court for error under an abuse of discretion standard. [Citation.] 'There must be substantial evidence adduced at the hearing that the minor is not a fit and proper subject for treatment as a juvenile before the court may certify him to the superior court for prosecution. [Citations.]' [Citation.] [¶] In reviewing the juvenile court's decision, '[t]he . . . court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is

19

reversible only if arbitrary and capricious.' [Citation.] 'All exercises of discretion must be guided by applicable legal principles . . . . [Citations.] If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal. [Citation.]' [Citation.] The 'discretion must be exercised in accordance and within the framework prescribed by the Legislature.' [Citation.]" (*J.N., supra,* 23 Cal.App.5th at pp. 714-715.)

"The standard is deferential: 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . .' [Citation.]" (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 681, fn. omitted (*Jones*).)

*I. Criminal Sophistication*

The first criterion is the degree of criminal sophistication exhibited by the minor. (§ 707(a)(3)(A)(i).) Section 707(a)(3)(A)(ii) specifies that when evaluating this criterion, "the juvenile court may give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense, the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior, the effect of familial, adult, or peer pressure on the minor's actions, and the effect of the minor's family and community environment and childhood trauma on the minor's criminal sophistication." The juvenile court found this factor weighed in favor of unsuitability.

L.R. argues the record includes no evidence establishing he was criminally sophisticated and the juvenile court improperly evaluated this criterion. He claims his

age, immaturity, underdeveloped intellectual capacity, and susceptibility to peer pressure supported the conclusion was not criminally sophisticated. Substantial evidence supported the court's conclusion.

The record demonstrated L.R. turned 16 years old less that one month before he shot and killed the two victims. In his report, Yepez stated L.R.'s parents indicated he met all development milestones and did not suffer any cognitive or developmental delays. The evidence unquestionably established he was above average intellectually because he was in GATE and honors classes. L.R. reported he purposefully failed those classes because his friends were not in those classes, which although unwise demonstrated calculated thinking. Additionally, he stated he sought acceptance from gang members, indicating he was susceptible to peer pressure.

As to the offenses, Yepez and Rogers both opined L.R. acted impulsively in response to Martinez's insult. But the evidence demonstrated L.R. armed himself with a gun and when Menchaca spotted a rival gang member, L.R. willingly participated in the gang hit up. After L.R. shot Martinez and Miller, he reloaded the gun. From this evidence one could reasonably conclude he was willing to continue his violent conduct. He then demonstrated shrewdness by giving the gun to Armendariz to dispose of. The court reasoned that although L.R. was 16 years old and subject to "some [peer] pressure," he was gifted intellectually and mentally and emotionally healthy. His conscious decision to arm himself, participate in a gang confrontation, shoot two people, and try to dispose of the incriminating evidence tended to establish sophisticated thinking. This was substantial evidence the court could reasonably rely on to conclude the OCDA proved by a preponderance of the evidence L.R. was criminally sophisticated.

L.R. contends the OCDA offered no evidence to dispute Yepez's and Rogers' findings. Rogers did not offer an ultimate opinion and her comments would support either conclusion. And Yepez opined he "display[ed] a moderate degree of

21

sophistication."  The court, in fact, relied on many of Yepez's and Roger's factual findings on this and other criterion.

We note the procedural posture of this case was unique and the juvenile court reviewed a plethora of material it would not have had if it heard the motion before trial and before L.R. spent 14 years in custody.  The court did mention each of the considerations supporting this first criterion.  Nevertheless, the court could have done a better job discussing all the evidence that related to this, and the other criterion.  The record includes other evidence that was relevant to this criterion, as the OCDA notes.  For example, L.R. wore gloves during the shooting and threw them as he fled.  There was sufficient evidence for the juvenile court to conclude the OCDA established *by a preponderance of the evidence* L.R. was criminally sophisticated.  But a more thorough discussion of that evidence would have provided a comprehensive picture of L.R.'s criminal sophistication and provided a more meaningful record for review.  (*C.S., supra,* 29 Cal.App.5th at p. 1029 [court required to identify specific facts that it found persuasive].)[4]

## II.  Future Attempts to Rehabilitate

The second criterion is "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction."  (§ 707(a)(3)(B)(i).)  Section 707(a)(3)(B)(ii) specifies that when evaluating this criterion, "the juvenile court may give weight to any relevant factor, including, but not limited to, the minor's potential to grow

---

[4]        In *C.S.,* the court stated, "The current version of the California Judges Benchguide 117 recommends that juvenile court judges 'use a ruling worksheet' and provides a sample worksheet.  (Cal. Judges Benchbook: Juvenile Delinquency Transfer of Jurisdiction Hearing (CJER 2018) Statement of Reasons, § 117.18.)  The sample worksheet, provided in appendix B of that benchbook, recommends that as to each of the section 707(a)(3) criteria, the juvenile court make a ruling as to whether 'the Petitioner [has/has not] met their burden' and whether each criterion 'mitigates [for/against] transfer to adult court.'"  (*C.S., supra,* 29 Cal.App.5th at p. 1029, fn. 11.)

and mature." The juvenile court found this factor neither weighed in favor of suitability or unsuitability—it was equal.

In his petition's factual recitation, L.R. states, "The court found this factor did not weigh in favor of petitioner being transferred to adult court." In his petition's argument section, he argues all the evidence supports the finding he could be rehabilitated before the juvenile court's jurisdiction terminates. In his reply however, L.R. cites to the juvenile court's comment there was insufficient time to rehabilitate him and states, "in the end [the juvenile] court ruled this factor weighed in favor of a transfer to adult court." He is wrong. The record reflects the court did not conclude this criterion weighed in favor of transfer to criminal court. Three times it stated this criterion was equal. We must determine whether the court's ruling was supported by substantial evidence. It was.

The record includes evidence L.R. made progress in his education, rehabilitation, and maturation. While in custody, he earned his high school diploma and self-studied various subjects. He attended a few therapy sessions. Finally, Father and Brother visited him and they both felt he had matured. Conversely, there was also evidence his progress did not conclusively establish the juvenile court could rehabilitate him before its jurisdiction terminated. The evidence demonstrated L.R. participated in the mass disturbance and tried to grab a deputy's hands because of prison politics. There was also evidence he refused rehabilitative programming because of prison politics. The court relied on this evidence to conclude that L.R. made "some strides," but it was concerned peer pressure continued to influence him and it would continue to do so if he were released. In essence, the court mused his progress was lacking and he still had to mature. Substantial evidence supported the court's conclusion this criterion was equal.[5]

---

[5] We remind the court, however, the prosecution has the burden to prove each criterion by a preponderance of the evidence. If the criterion was equal, the prosecution did not satisfy its burden.

23

L.R. argues his performance demonstrated "[h]is potential to grow and mature is boundless[]" and there was plenty of time for him to rehabilitate before the juvenile court's jurisdiction terminated. He cites to the specific programming that he states will help rehabilitate him. L.R. claims he "moved away from gang involvement" and the record includes no evidence "would be oppositional, defiant, anti-social or recalcitrant."

The OCDA argues the juvenile court erred because the following evidence the court did not mention demonstrated L.R. could not be rehabilitated before the juvenile court's jurisdiction terminated: there was no evidence L.R. left the gang; while in juvenile hall he got a gang tattoo and displayed gang hand signs in church; he received 31 disciplinary actions of various degrees while he was in custody;[6] L.R. would likely receive 18 months of rehabilitation for a crime that required between 47 and 70 months of rehabilitation; DJJ did not have the gang intervention programming he required; and Rogers opined "there should be a careful plan in place . . . with particular focus upon substance abuse treatment."

The parties ask this court to reweigh the evidence and the court's determination and reach a different result on this criterion. That is not our role. (*Jones, supra,* 18 Cal.4th at p. 681.) Substantial evidence supported the court's conclusion this criterion was equal.

### III. Previous Delinquent History

The third criterion is the minor's previous delinquent history. (§ 707(a)(3)(C)(i).) Section 707(a)(3)(C)(ii) specifies that when evaluating this criterion, "the juvenile court may give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's

---

[6]     In his report, Yepez "credit[ed]" L.R. for his "minimal" in-custody disciplinary history. We do not share Yepez's characterization of L.R.'s disciplinary history. Our recitation of his major disciplinary violations speak for themselves.

family and community environment and childhood trauma on the minor's previous delinquent behavior." The juvenile court found this factor weighed in favor of suitability.

The record is void of any evidence L.R. *previously* suffered true findings in the juvenile court. The juvenile court explained that although L.R. exercised poor judgment in school and by associating with gang members, he did not suffer any charges. The court was not persuaded by the uncharged conduct evidence because Menchaca got a plea deal in exchange for his testimony.

The OCDA, however, asserts the uncharged conduct evidence was evidence of his delinquent history and supported transfer to criminal court. In essence, the OCDA asks this court to reweigh the evidence and the court's determination and reach a different result. Again, that is not our role. (*Jones, supra,* 18 Cal.4th at p. 681.) Substantial evidence supports the court's conclusion this criterion weighed in favor of retention.

### IV. *Previous Attempts to Rehabilitate*

The fourth criterion is the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor." (§ 707(a)(3)(D)(i).) Section 707(a)(3)(D)(ii) specifies that when evaluating this criterion, "the juvenile court may give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs." The juvenile court found this factor weighed in favor of suitability.

Again, there was no evidence L.R. *previously* suffered true findings in the juvenile court, and thus, the juvenile court had made no previous efforts to rehabilitate him. The juvenile court explained that although L.R. refused to participate in substance abuse counseling, the juvenile court had not made any efforts to rehabilitate him. The OCDA does not challenge the court's conclusion. Substantial evidence supports the court's conclusion this criterion weighed in favor of retention.

25

## V. Circumstances and Gravity of the Offense

The fifth criterion is the circumstances and gravity of the offense alleged to have been committed by the minor. (§ 707(a)(3)(E)(i).) Section 707(a)(3)(E)(ii) specifies that when evaluating this criterion, "the juvenile court may give weight to any relevant factor, including but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development." Section 707 "does not exclude juveniles charged with murder from consideration for treatment in juvenile court." (*J.N., supra,* 23 Cal.App.5th at p. 724.) The juvenile court found this factor weighed in favor of unsuitability.

L.R. initially asserts the juvenile court erred because section 707 does not exclude juveniles charged with murder from consideration for treatment in juvenile court and the court did not identify any circumstances that was more grave than any other homicide. But curiously he states the following: "Admittedly, there was some evidence supporting the court's conclusion that criterion five weighed against [him] remaining in juvenile court. . . . The record contains substantial evidence showing one of the five criteria – gravity and the circumstances of the offense – weighed in favor of adult court, but that the remaining criteria weighed in favor of juvenile court." L.R. first challenges the court's conclusion then seems to concede the court properly weighed this criterion required transfer. Nevertheless, we will not accept his apparent concession but instead address the merits.

The record includes evidence L.R. knowingly participated in a gang confrontation where he intentionally shot and killed two people and prepared to commit more violence. L.R. armed himself with a loaded gun before walking with his fellow gang members. During their midnight walk, Menchaca saw Martinez, a rival gang member, and created a distraction. When Martinez insulted them, L.R. shot the rival gang member one time. He then turned the gun on Miller, who did not participate in the

26

encounter, and shot her preventing her from aiding Martinez. L.R. returned the gun to the rival gang member and shot a few more times to ensure he was dead. One can only surmise what L.R. was thinking. But one can reasonably conclude that after eliminating a rival gang member, he disabled the gang member's companion, and then ensured the gang member was dead, evincing a calculated thinking.

In addressing this criterion, the juvenile court addressed each of the relevant characteristics. The court noted the evidence demonstrated L.R. did not suffer any significant trauma that would mitigate his conduct. The court concluded L.R.'s personal conduct of intentionally shooting two people resulting in their deaths was sufficiently grave to warrant transferring him to criminal court. Substantial evidence supports the court's conclusion. We recognize a juvenile who commits murder is not prevented from benefitting from the juvenile court's rehabilitation efforts. However, the court's conclusion based on the circumstances of these *two* gang-related murders was not beyond the bounds of reason. Contrary to L.R.'s claim, this was not a garden variety murder. He committed two murders that made him eligible for the death penalty. (§ 190.2, subd. (a)(3).)

L.R. relies on *J.N., supra,* 23 Cal.App.5th 706, to argue the court erred by ordering him transferred to criminal court. In *J.N.*, the juvenile court's order specified three section 707 criteria weighed against transfer to criminal court and two section 707 criteria weighed in favor of transfer to criminal court. (*J.N., supra,* 23 Cal.App.5th at p. 715.) The *J.N.* court concluded substantial evidence supported the court's findings as to the three section 707 criterion that weighed against transfer to criminal court. But it concluded no substantial evidence supported the court's findings the other two criteria weighed in favor of transfer to criminal court. One of those factors was the circumstances and gravity of the offense. As to that factor, J.N. was not the shooter and he was shaken by the killing. (*J.N., supra,* 23 Cal.App.5th at p. 724.) The *J.N.* court thus

27

concluded the juvenile court abused its discretion by ordering him transferred to criminal court.  (*Ibid*.)

L.R. acknowledges that J.N. was not the shooter but he claims the facts "are not so distinguishable" as to limit its applicability here.  The factual distinction makes all the difference.  L.R. was the shooter, and he killed two people.  *J.N.* is of no help to L.R.  Substantial evidence supported the juvenile court's conclusion the OCDA proved by a preponderance of the evidence the circumstances and gravity of the offenses weighed in favor of transfer.

*VI.  Evaluative Process*

The juvenile court made express findings as to which criterion weighed in favor of retention, transfer, or were neutral.  The court concluded the first and fifth criteria supported transfer.  But it found the third and fourth criteria supported retention.  That left the second criteria, which it opined neither supported transfer nor retention.  The court's ruling effectively ended evenly balanced.  The court concluded "in totality" the prosecution satisfied its burden of proving L.R. was not suitable for juvenile court by a preponderance of the evidence.

In doing so, however, the juvenile court failed to perform an important part of the evaluative process by articulating how it cumulatively weighed the different statutory criterion and how that weighing affected its decision to transfer L.R. to the criminal court.  In the future, the court should perform this step to provide the appellate court with a more complete record for review.

Nevertheless, we are mindful section 707 does not require the juvenile court to give equal weight to each of the factors.  Additionally, a court does not necessarily abuse its discretion by finding one criterion outweighed the other criteria.  (*C.S., supra,* 29 Cal.App.5th at p. 1035.)  Based on juvenile court's comments we can reasonably conclude the first criterion (criminal sophistication) and the fifth criterion (circumstances and gravity of the offense) outweighed the other criterion.   Based on our

28

conclusion substantial evidence supported the court's findings on each criterion, the court did not abuse its discretion by ordering L.R. transferred to criminal court.

DISPOSITION

The petition is denied.

O'LEARY, P. J.

WE CONCUR:

FYBEL, J.

THOMPSON, J.